672 So.2d 517 (1996)
Max ELKINS, et al., Petitioners,
v.
Elisa SYKEN, et al., Respondents.
No. 84649.
Supreme Court of Florida.
April 11, 1996.
*518 Robert A. Robbins of Robbins & Reynolds, P.A., Miami, Joel S. Perwin of Podhurst, Orseck, Josefsberg, Eaton, Meadow, Olin & Perwin, P.A., Miami, Barbara Green, Miami, and Richard A. Friend and Richard A. Warren, South Miami, for Petitioners.
James T. Sparkman of Clark, Sparkman, Robb, Nelson & Mason, Fort Lauderdale, and Raoul G. Cantero, III and Jared Gelles of Adorno & Zeder, P.A., Miami, for Respondents.
Roy D. Wasson, Miami, for The Academy of Florida Trial Lawyers, Amicus Curiae.
Paul R. Regensdorf of Fleming, O'Bryan & Fleming, P.A., Fort Lauderdale, for The Florida Defense Lawyers Association, Amicus Curiae.
OVERTON, Justice.
This is a petition to review the Third District Court of Appeal's en banc decision in Syken v. Elkins, 644 So.2d 539 (Fla. 3d DCA 1994), which concerns the appropriate scope of discovery necessary to impeach the testimony of an opponent's expert medical witness. In Syken, two unrelated personal injury actions were consolidated by the district court for review.[1] In both actions, the trial judges issued orders directing defendants' expert witnesses, who were physicians, to produce tax records, income tax returns, and information regarding patients who were examined for purposes of litigation in unrelated actions. In a unanimous en banc decision, the district court reversed these orders, finding that the requested information was overly burdensome and provided little useful information. The district court then set forth specific criteria to assist trial judges in addressing this expanding problem. By separate order, the district court of appeal certified that its decision conflicted with the district court decisions in Abdel-Fattah v. Taub, 617 So.2d 429 (Fla. 4th DCA 1993) (non-party expert required to compile information regarding defense-required examinations for past year), Bissell Bros., Inc. v. Fares, 611 So.2d 620 (Fla. 2d DCA 1993) (IRS Form 1099's subject to discovery), and Young v. Santos, 611 So.2d 586 (Fla. 4th DCA 1993) (tax returns and independent medical examinations (IMEs) discoverable).[2] For the reasons expressed, we approve the well-reasoned decision of the district court, and we adopt in full the district court's criteria governing the discovery of financial information from expert witnesses. We also direct that the criteria be made part of the *519 commentary to Florida Rule of Civil Procedure 1.280.
At the outset, it is important to recognize that the issues in this case affect plaintiffs and defendants equally. For instance, in the two instant cases, it was plaintiff's counsel who sought substantial personal financial information from the medical expert witnesses for the defense. On the other hand, in Wood v. Tallahassee Memorial Regional Medical Center, Inc., 593 So.2d 1140 (Fla. 1st DCA 1992), review denied, 599 So.2d 1281 (Fla. 1992), it was defense counsel who sought similar financial information from the plaintiff's expert medical witness. Thus, our decision today will provide protection to experts for both plaintiffs and defendants by preventing the unnecessary and overly burdensome disclosure of personal financial information and by possibly forestalling any chilling effect on the availability of expert witnesses. With this purpose in mind, we turn to the facts of the instant consolidated cases.
The facts of these cases were set forth by the district court as follows:

The Facts in Syken v. Elkins
In February 1993, by subpoena duces tecum, counsel for Max Elkins, plaintiff in an automobile personal injury action, scheduled the deposition of the records custodian/bookkeeper of defendant Elisa Syken's orthopedic expert, Dr. Richard Glatzer. The information sought required documentation of income earned by the expert from independent medical examinations (IMEs) since January 1, 1990; the percentage of IME income relative to private patient income since January 1, 1990; the numbers of IME exams performed for insurance carriers and for defense attorneys since January 1, 1990; disclosure of the amount charged for IMEs, and review of the expert's medical records for the past twelve months; the number of impairment ratings given since January 1, 1990; and the number of court appearances and attorney conferences and relative charges since January 1990.
Defendant's counsel filed an objection and motion for protective order. The trial judge denied the motion and required the expert to set forth the cost of producing the above information. The initial affidavit of Dr. Glatzer was filed February 12, 1993. Thereafter, Elkins filed a motion to require Dr. Glatzer's bookkeeper to comply with the subpoena, and filed a response to the affidavit. In response to Elkins' motion, the trial court ordered Dr. Glatzer to appear for an evidentiary hearing. Prior to that hearing, on May 6, 1993, the record reveals that the doctor submitted a notarized affidavit stating, in part:
5. Finally, at the request of defense counsel, I have examined my calendar for last week and this week in order to come to a reasonable approximation of the number of IME's I do in a year. Last week, I worked 4 days and saw 56 patients, of which only 3 were for the purpose of performing IME's. This week I am working only 2 days, but I am seeing 36 patients, of which 6 are for the purpose of performing IME's. Presently, I work 4 days per week. Extrapolating this information, I believe it is reasonable to conclude that I see, on average 15.33 patients per day, of which 1.5 patients are seen for performing IME's. I work approximately 48 weeks per year. As such, I believe it is reasonable to estimate that I see 2944 patients per year, of which 288 are seen for IME's. My average charge for an IME, including performing and reviewing x-rays is $500. As such a reasonable estimate of my P.A.'s income from IME's is $144,000 per year. Additionally, I attend court approximately 10-12 times per year at a rate of $500 per hour and I give approximately 5-10 depositions per year at a rate of $450 per hour.
[At a hearing before the trial court], Dr. Glatzer was questioned by the trial judge and Elkins' attorney. Two interested attorneys, involved in similar discovery pursuits on separate personal injury cases, were allowed to assist. Dr. Glatzer was asked about the contents of his affidavit in the present case as well as a second similar affidavit.
Dr. Glatzer explained that his patient files are kept alphabetically and not chronologically, *520 and that the estimated 15,000 patient files covered 25 years of practice in Dade County. The doctor expressed concern that compliance with the subpoena would require him to close his medical practice, due to the fact that his office personnel could not perform the task of gathering the requested materials during regular working hours in light of their duties in running his medical practice. Further, the doctor claimed that 1099 forms are not probative of medical legal charges because they do not differentiate between such charges and private patient charges. At the conclusion of the hearing, the trial judge issued the three orders appealed herein, in sum requiring the compilation of reports from the doctor's files, the implementation of new procedures for recording IME's and creation of new documents evidencing time spent on IME's, and production of 1099 tax forms for the last three years.

The Facts in Plaza v. Roth
Michael Roth, plaintiff below, alleged he was injured when the ceiling in his apartment fell on him. Roth sued Plaza of the Americas Part IV Condominium Association, Inc. (Plaza), the association which owns the building's common areas. Plaza hired Ledford Gregory, M.D. to conduct an IME of Roth. Thereafter, through interrogatories, Roth requested the identity of every person Dr. Gregory had examined at the request of Plaza's counsel. Plaza objected, and Roth moved to compel a response. The trial judge ordered Plaza to procure from Dr. Gregory an affidavit identifying every person examined by Dr. Gregory, or about whom Dr. Gregory had testified, pursuant to an authorization from Plaza's law firm. Subsequently, Roth issued a subpoena duces tecum to Dr. Gregory requesting, among other things, copies of
all bills issued by [Dr. Gregory] as a defense expert examiner to any insurance company or law firm during a certain period; and
all journals, ledgers, and 1099 forms pertaining to payments received by [Dr. Gregory] during a certain period, for examinations performed at the request of any insurance company or law firm.
Plaza objected to the request. The trial judge denied the objection.
In response to the subpoena, Dr. Gregory filed his affidavit, which stated that his office did not segregate files according to whether the patient was seen for an IME, and that his office maintains no central file or computer program from which the requested information could readily be retrieved. According to the affidavit, all the doctor's office files would have to be reviewed in order to determine which patients were given IMEs, and which patients were referred by Plaza's law firm, requiring "great amounts of money and time." He also stated in the affidavit that he did not keep his Internal Revenue Service 1099 forms. Roth filed a motion for contempt or sanctions.
After a hearing, the trial judge issued the order, reproduced in part below, from which Dr. Gregory seeks review.
A. Dr. Ledford Gregory is to sign a release for 1099 forms which is to be furnished by the Plaintiff and that will be sent to the IRS. Further, Ledford Gregory, M.D., P.A., shall produce its federal income tax returns for the years 1990, 1991 and 1992, to counsel for the plaintiff. Dr. Gregory is to produce the documents within ten (10) days from the date of this hearing.
Syken v. Elkins, 644 So.2d 539, 541-43 (footnote omitted).
On appeal, the district court quashed the trial court orders, concluding that they were too burdensome. The district court determined that, to demonstrate the probability of bias, it is sufficient for a doctor to be asked to give an approximate estimate for IMEs and total patients seen in a year; that the figures need not be exact (an honest estimate is sufficient); that the doctor should not be required to disclose the amount of money earned from expert witness work or to disclose his or her total income; and that income tax returns and form 1099s need not be produced given their limited probative value. The district court then set forth the *521 following eight criteria to be followed in seeking financial information from opposing medical experts:
1. The medical expert may be deposed either orally or by written deposition.
2. The expert may be asked as to the pending case, what he or she has been hired to do and what the compensation is to be.
3. The expert may be asked what expert work he or she generally does. Is the work performed for the plaintiffs, defendants, or some percentage of each?
4. The expert may be asked to give an approximation of the portion of their professional time or work devoted to service as an expert. This can be a fair estimate of some reasonable and truthful component of that work, such as hours expended, or percentage of income earned from that source, or the approximate number of IME's that he or she performs in one year. The expert need not answer how much money he or she earns as an expert or how much the expert's total annual income is.
5. The expert may be required to identify specifically each case in which he or she has actually testified, whether by deposition or at trial, going back a reasonable period of time, which is normally three years. A longer period of time may be inquired into under some circumstances.
6. The production of the expert's business records, files, and 1099's may be ordered produced only upon the most unusual or compelling circumstance.
7. The patient's privacy must be observed.
8. An expert may not be compelled to compile or produce nonexistent documents.
Id. at 546 (footnotes omitted). In explaining the need for these criteria, the district court stated:
We have adopted the foregoing criteria... in an effort to prevent the annoyance, embarrassment, oppression, undue burden, or expense, claimed on behalf of medical experts. Within the limits of permitted discovery, medical experts are obligated to testify on a reasonable basis, truthfully, fully and freely. When it is disclosed or made apparent to the trial court that such a witness has falsified, misrepresented, or obfuscated the required data, the aggrieved party may move to exclude the witness from testifying or move to strike that witness's testimony and or further, move for the imposition of costs and attorney's fees in gathering the information necessary to expose the miscreant expert.
Id. at 546-47.
The petitioners argue that the criteria set forth by the district court constrict a litigant's ability to probe the biases of the other side's expert because, without additional discovery, no way exists to disprove the accuracy of the expert's statements. Further, the petitioners assert that because many "professional witnesses" derive most of their income from testifying as expert witnesses, the discovery of income tax returns and other related documents is necessary to attack the credibility of these witnesses. In support of their argument, petitioners cite to several cases in which other district courts have allowed for the discovery of such financial information. See, e.g., Bissell Bros., Inc. (1099 forms subject to discovery to disclose bias); Wood (records of this type are relevant to credibility as an expert); McAdoo v. Ogden, 573 So.2d 1084 (Fla. 4th DCA 1991) (bills for services rendered as defense expert discoverable to show potential bias). Notably, the district court in this case specifically rejected this argument, finding that
decisions in this field have gone too far in permitting burdensome inquiry into the financial affairs of physicians, providing information which "serves only to emphasize in unnecessary detail that which would be apparent to the jury on the simplest cross-examination: that certain doctors are consistently chosen by a particular side in personal injury cases to testify on its respective behalf." LeJeune [ v. Aikin ], 624 So.2d [788, 790 (Fla. 3d DCA 1993)] (Schwartz, C.J., specially concurring); see Young v. Santos, 611 So.2d 586, 587-88 (Fla. 4th DCA 1993) (Warner, J., concurring).
The production of the information ordered in the cases before us causes annoyance and embarrassment, while providing *522 little useful information. In Syken, the court ordered additional discovery which, in light of the doctor's affidavit, is only duplicative, annoying and oppressive. In Plaza, the information necessary to demonstrate the basis for a claim of bias is most likely readily available through oral or written deposition without intrusive and improper examination of the doctor's 1099 forms and federal income tax returns. The least burdensome route of discovery, through oral or written deposition, was simply not followed.
Syken, 644 So.2d at 545 (footnote omitted). We find that the district court's opinion strikes a reasonable balance between a party's need for information concerning an expert witness's potential bias and the witness's right to be free from burdensome and intrusive production requests.
In addressing this issue, it is essential that we keep in mind the purpose of discovery. Pretrial discovery was implemented to simplify the issues in a case, to eliminate the element of surprise, to encourage the settlement of cases, to avoid costly litigation, and to achieve a balanced search for the truth to ensure a fair trial. Dodson v. Persell, 390 So.2d 704 (Fla.1980); Surf Drugs, Inc. v. Vermette, 236 So.2d 108 (Fla. 1970). Discovery was never intended to be used as a tactical tool to harass an adversary in a manner that actually chills the availability of information by non-party witnesses; nor was it intended to make the discovery process so expensive that it could effectively deny access to information and witnesses or force parties to resolve their disputes unjustly. To allow discovery that is overly burdensome and that harasses, embarrasses, and annoys one's adversary would lead to a lack of public confidence in the credibility of the civil court process. The right to a jury trial in the constitution means nothing if the public has no faith in the process and if the cost and expense are so great that access is basically denied to all but the few who can afford it. In essence, an overly burdensome, expensive discovery process will cause many qualified experts, including those who testify only on an occasional basis, to refrain from participating in the process, particularly if they have the perception that the process could invade their personal privacy. To adopt petitioners' arguments could have a chilling effect on the ability to obtain doctors willing to testify and could cause future trials to consist of many days of questioning on the collateral issue of expert bias rather than on the true issues of liability and damages.
The district court engaged in an extensive and well-reasoned analysis of the problem, and we find that the criteria set forth in its opinion are proper. We believe that the district court's criteria focus on the use of the discovery process in a proper manner, eliminating much of the potential for harassing or causing unnecessary time and expense to a party or witness, and providing parties and trial courts with the guidance necessary to focus on the original purpose and intent of discovery. Additionally, as we stated previously, this issue affects both plaintiffs and defendants alikewhile the two cases before us involve pretrial discovery of defense medical experts, other cases involve plaintiff medical experts. See, e.g., Wood. Our decision today is in no way intended to favor either plaintiffs or defendants; it is intended to reach a proper balance to protect the rights of both.
Accordingly, we approve the opinion of the district court of appeal in its entirety. We also conclude that the district court's criteria should be included as commentary to Florida Rule of Civil Procedure 1.280. We disapprove the opinions in Abdel-Fattah, Bissell Bros., Inc., Young, Crandall v. Michaud, 603 So.2d 637 (Fla. 4th DCA 1992) (1099s relevant to issue of bias), Wood, and McAdoo to the extent they are inconsistent with this opinion.
It is so ordered.
GRIMES, C.J., and SHAW, KOGAN, HARDING and WELLS, JJ., concur.
ANSTEAD, J., concurs specially with an opinion, in which KOGAN, J., concurs.
ANSTEAD, Justice, specially concurring.
I concur in the majority opinion, especially its endorsement of Judge Nesbitt's thorough *523 and comprehensive opinion for the district court.
We have been fortunate in Florida to enjoy the free flow of information in both our civil and criminal justice systems. That free flow has served as the bedrock of our system and is, perhaps, the single greatest factor in the system's ability to produce a just result in disputes brought to it for resolution. However, we must be very careful not to allow abuses of the system to endanger the life of the open system itself. It is for the protection of the continued health of our overall open system of justice that we act today to curb some of the perceived abuses of our liberal system of discovery. It is also important to recognize that we are dealing with discovery as to a collateral issue.
Finally, we should recognize that our ruling today, while essentially constrictive, still places great authority and discretion in the hands of the trial judges of this state. As noted by Judge Nesbitt:
These remedies, available at the trial judge's discretion, place trial counsel on notice to only engage reputable physicians. The exclusion or striking of an expert's testimony may result in the offending party being left with no expert testimony at trial. This is particularly so when the exclusion or striking occurs past the cut-off period for exchange of witnesses under a pretrial order. Of course, trial judges have discretion to vary the guidelines where appropriate and to impose less severe sanctions where warranted.
Syken v. Elkins, 644 So.2d 539, 547 (Fla. 3d DCA 1994).
KOGAN, J., concurs.
NOTES
[1] Syken v. Elkins and Plaza of the Americas v. Roth.
[2] We have jurisdiction. Art. V, § 3(b)(4), Fla. Const.