DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**ORTHOPEDIC CENTER OF SOUTH FLORIDA,**
Petitioner,

v.

**MICHAEL SODE,**
Respondent.

No. 4D18-3478

[June 12, 2019]

Petition for writ of certiorari to the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Raag Singhal, Judge; L.T. Case No. CACE-17-011371.

Richard A. Jarolem of Traub Lieberman Straus & Shrewsberry, LLP, Palm Beach Gardens, for petitioner.

Andrew A. Harris of Burlington & Rockenbach, P.A., West Palm Beach, and Thomas H. Leeder of Leeder Law, Plantation, for respondent.

CONNER, J.

In this case, we address a matter of first impression: the extent to which the financial discovery limitations applicable to an expert apply to the business entity with which the expert is affiliated. Orthopedic Center of South Florida ("Petitioner"), a non-party in the action below, petitions for a writ of certiorari, seeking to quash a discovery order overruling its objections to a proposed subpoena duces tecum. The proposed subpoena was served on Petitioner by Michael Sode ("Respondent"). Petitioner contends the order compelling it to produce certain documents for "reference purposes only" at deposition is beyond the scope of permissible discovery under Florida Rule of Civil Procedure 1.280(b)(5) and *Elkins v. Syken,* 672 So. 2d 517 (Fla. 1996). We grant the petition because we conclude that: (1) the protections from invasive discovery afforded to individual experts apply equally to the business entity with which the expert is affiliated; (2) Respondent used an improper discovery methodology; and (3) the order grants impermissible discovery.

*Background*

In the action below, Respondent filed a complaint against the defendant for alleged injuries he suffered in a bicycle accident. Respondent served a proposed subpoena duces tecum on Petitioner, the business entity under which the doctor who performed the compulsory medical exam runs his practice.

Petitioner objected to the discovery requests and moved for a protective order. At the hearing, Petitioner conceded that Respondent was entitled to some discovery pursuant to *Allstate Insurance Co. v. Boecher*, 733 So. 2d 993 (Fla. 1999). However, Petitioner contended that most of what Respondent sought was not proper discovery from the examining doctor, who was an expert under rule 1.280(b)(5)(A)(iii). Petitioner argued, therefore, that Respondent could not circumvent the rule by requesting the otherwise impermissible discovery from the non-party corporate entity affiliated with the examining doctor.

Respondent argued that the limits of *Elkins* and rule 1.280(b)(5) do not apply to Petitioner because it is a corporation, and it is not afforded the protections of an expert. Respondent argued that the defense expert, along with several other doctors, are officers, directors, and partners of Petitioner. Respondent asserted that five out of nine of the doctors, who are owners of Petitioner, perform compulsory medical examinations for the defense. Respondents contended that the partners share in the revenue and profits, and that could point to financial bias and incentive for the defense expert to accept a certain type of case. Respondent also pointed out that it learned through a deposition that the defense firm had hired Petitioner 120 times in three years, showing that Petitioner had made hundreds of thousands of dollars from this type of work.

The trial court sustained some objections and overruled others. The trial court did not address Petitioner's objections that the discovery exceeded rule 1.280(b)(5), or that such discovery requests were burdensome and invasive on a non-party. The trial court did not make findings of "unusual or compelling circumstances," but it compelled the discovery. *See* Fla. R. Civ. P. 1.280(b)(5)(A). The trial court ordered that Petitioner's representative must bring to the deposition "for reference purposes only" documents responsive to Respondent's requests 1, 2, 6, 8-12, and 15. These paragraphs requested documents pertaining to the following:

    1. **Voire Dire of the Designated Witness(es):** Does the witness maintain a *curriculum vitae* or resume?

2

Please provide a brief description of your biographical background, including your employment history and educational history.  Please describe your relationship with the Practice[] and the provenance of your designation as its witness for the relevant subject matters.  Please describe all steps you have taken to prepare for your testimony on those subjects matters for which you have been designated, including, where appropriate, persons interviewed and documents reviewed.   Have you prepared any notes, written summaries, or document collections to assist you in making your testimony accurate and complete?  Have you brought those with you today?   During your testimony, will you refer to any such notes, written summaries, or document collections when necessary to ensure your testimony is accurate and complete?

2. **Overview and Ownership.**   Describe the medical Practice's business model and primary business activities.  Does the medical Practice have any signed contracts with the Defendant, Defendant's Insurance Company, or Defendant's Law Firm[?]  Provide the names and identities of all persons or entities who hold or have held a direct or indirect ownership interest in your Practice.  Describe how the owners share and divide in the Practice[']s profits, revenues, and expenses.  Does the medical Practice track the amount of business generated by each doctor within the Practice?  If yes, how so?  Does the doctor that brings in or obtains the patient or medical exam receive a larger share of the revenue generated by that examination?  Do the other doctors within the Practice also share in the revenue generated by the doctor that brought in the patient or exam to a lesser degree?

. . . .

6. **Revenues.**  The percentage of your revenue that is generated from providing medical services in the last three full years.  Please be prepared to specific [sic] the percentage of revenue derived from (1) Defense Compulsory Medical Exams (DCME); (2) PIP

3

Independent Medical Exams (PIP IME); (3) Worker's Compensation Claims; (4) Fees for Depositions on behalf of Defendants; (5) Trial Testimony on behalf of Defendants; (6) Letters of Protection; (7) Health Insurance; (8) PIP; (9) Consulting Work. Please be prepared to provide the revenue percentage or split for your treatment of patients that actually choose your Practice versus patients that were referred to your Practice for treatment or medical evaluations by employers, insurance companies, defense law firms or their servicing agents.

. . . .

8. **Letters of Protection (LOP).** Has your Practice accepted LOPs? Under what circumstances does or has your Practice accept[ed] LOPs? How many LOPs have you accepted in each year? Does accepting an LOP in anyway change your doctor's care and treatment of a patient? Whether the Practice has ever accepted less than full face value of a medical bill generated under LOP, and if so, the average percentage discount you have accepted.

9. **DCMEs.** Does your Practice perform DCME? Identify each doctor within your Practice that performs DCME. Who makes the decision in choosing your doctors to perform the DCME? Who are you hired by to perform the DCME? Provide the total number of DCMEs performed by all the doctors in your Practice. Please be able to further specify how many DCMEs were performed by each doctor within your Practice for each year. Please identify each insurance company that [has] paid you for performing these DCMEs for each year and the number of times per year. Please identify each defense law firm that you [sic] enlisted your services in performing DCME for each year and the number of times per year.

10. **PIP IMEs.** Does your Practice perform PIP IMEs? Identify each doctor within your Practice that performs PIP IMEs. Who chooses your doctors to perform the PIP IMEs? Who are you hired by to perform the PIP IMEs? Does the injured party choose your doctor? Provide the total

number of PIP IMEs performed by all the doctors in your Practice for each year. Please be able to further specify how many PIP IMEs were performed by each doctor within your Practice for each year. Please identify each insurance company that [has] paid you for performing these PIP IMEs for each year and the number of times per year. Please identify each defense law firm that you [sic] enlisted your services in performing PIP IMEs for each year and the number of times per year.

11. **Worker's Compensation.** Does your Practice accept worker's compensation cases? How does your practice obtain worker's compensation cases? Identify the doctors in your Practice that provide worker's compensation medical care and treatment to injured employee/patient. Does the injured employee/patient get to choose your Practice or doctors as their initial choice doctor? Does the employer, worker's compensation insurance company, or servicing agent get to choose your Practice as the injured employee's initial choice of doctor? How many injured employees/patients worker's compensation cases does your Practice obtain each year as the initial treating physician? Does your Practice perform IMEs for employers, worker's compensation insurance companies, or their servicing agents? If so, how many IMEs does your Practice perform each year for the employer, worker's compensation insurance carrier, and servicing agent? Specify how many IMEs each doctor performs per year for the employer, worker's compensation insurance carrier, and servicing agent. Does you[r] Practice perform IMEs for injured Employees/Claimants? If so, how many IMEs does your Practice perform each year for injured Employees/Claimants?

12. **Consulting.** Provide the total number of times you have performed consulting work on behalf of any defendants, insurance companies, and defense law firms. Please be able to further specify how many were performed by each doctor in the Practice for each year.

. . . .

15. **Marketing and Advertising.** Does your Practice market or advertise its services?  If so, what services does it market or advertise?  How does your Practice market or advertise?  Does it use any online services or websites?  If so, identify each online service or website that the Practice uses?  What specific services does the Practice market or advertise using the online services or websites?

*Certiorari Analysis*

Certiorari review is discretionary.  *Grabel v. Sterrett*, 163 So. 3d 704, 706 (Fla. 4th DCA 2015).  Before relief may be granted, the petition must establish a departure from the essential requirements of law, resulting in material injury that cannot be corrected on post-judgment appeal.  *Id.*  "Certiorari jurisdiction does not lie to review every erroneous discovery order."  *Katzman v. Rediron Fabrication, Inc.,* 76 So. 3d 1060, 1062 (Fla. 4th DCA 2011) (citing *Allstate Ins. Co. v. Langston*, 655 So. 2d 91, 94 (Fla. 1995)).  As such, appellate courts generally do "not review orders denying a party's over-breadth or burdensome[] objections to discovery."  *Id.*  However, disclosure of otherwise private financial information can result in irreparable harm if a petitioner affirmatively establishes the discovery is irrelevant to any issue in the litigation.  *Id.*

Respondents contend that because the discovery order is not the subject of a "clearly established principle," certiorari relief is not available, and Petitioner will have to wait for a resolution when and if a plenary appeal is brought.  However, "Petitioner is a non-party, [and] to the extent the order compels production of cat-out-of-the-bag information, certiorari jurisdiction lies."  *Grabel,* 163 So. 3d at 706.

We grant certiorari relief because we conclude that the protections from invasive discovery afforded to individual experts apply equally to the business entity with which the expert is affiliated.  That being the case, we determine that certiorari relief should be granted for two additional reasons: (1) Respondent used an inappropriate methodology for discovery; and (2) the proposed subpoena duces tecum seeks unauthorized information.  We explain our reasoning.

*Protections Afforded to Individual Experts Apply to Business Entities*

In *Elkins,* our supreme court recognized the necessity of striking a balance between a party's need for information to demonstrate a medical expert's potential bias, with the expert's right to be free from burdensome and intrusive discovery requests.  672 So. 2d at 522.  In striking that

balance, the supreme court adopted rule 1.280(b)(5), which limits discovery from experts who are obviously hired by one party. *See Worley v. Cent. Fla. Young Men's Christian Ass'n*, 228 So. 3d 18, 22-23 (Fla. 2017) (discussing reasons for adopting rule 1.280(b)(5)(A)(iii)). The limitations were deemed necessary to prevent overly intrusive and harassing financial discovery which "serves only to emphasize in unnecessary detail that which would be apparent to the jury on the simplest cross-examination: that certain doctors are consistently chosen by a particular side in personal injury cases to testify on its respective behalf." *Elkins*, 672 So. 2d at 521 (approving and quoting *Syken v. Elkins*, 644 So. 2d 539, 545 (Fla. 3d DCA 1994)). The *Elkins* court further explained:

> Discovery was never intended to be used as a tactical tool to harass an adversary in a manner that actually chills the availability of information by non-party witnesses; nor was it intended to make the discovery process so expensive that it could effectively deny access to information and witnesses or force parties to resolve their disputes unjustly. To allow discovery that is overly burdensome and that harasses, embarrasses, and annoys one's adversary would lead to a lack of public confidence in the credibility of the civil court process. The right to a jury trial in the constitution means nothing if the public has no faith in the process and if the cost and expense are so great that access is basically denied to all but the few who can afford it. In essence, an overly burdensome, expensive discovery process will cause many qualified experts, including those who testify only on an occasional basis, to refrain from participating in the process, particularly if they have the perception that the process could invade their personal privacy.

*Id.* at 522.

Rule 1.280(b)(5) specifically provides:

> (5) *Trial Preparation: Experts.* Discovery of facts known and opinions held by experts, otherwise discoverable under the provisions of subdivision (b)(1) of this rule and acquired or developed in anticipation of litigation or for trial, may be obtained only as follows:
>
> . . . .

7

(A)(iii) A party may obtain the following discovery regarding any person disclosed by interrogatories or otherwise as a person expected to be called as an expert witness at trial:

1. The scope of employment in the pending case and *the compensation for such service.*

2. The expert's general litigation experience, including *the percentage of work performed for plaintiffs and defendants.*

3. The identity of other cases, within a reasonable time period, in which the expert has testified by deposition or at trial.

4. An approximation of the portion of the expert's involvement as an expert witness, which may be based on *the number of hours, percentage of hours, or percentage of earned income derived from serving as an expert witness*; however, the expert shall not be required to disclose his or her earnings as an expert witness or income derived from other services.

*An expert may be required to produce financial and business records only under the most unusual or compelling circumstances and may not be compelled to compile or produce nonexistent documents.* Upon motion, the court may order further discovery by other means, subject to such restrictions as to scope and other provisions pursuant to subdivision (b)(5)(C) of this rule concerning fees and expenses as the court may deem appropriate.

*Id.* (emphases added).

We conclude that the protections afforded to an expert under rule 1.280(b)(5)(A)(iii) and *Elkins* should extend to Petitioner, the non-party corporate entity with which the expert is affiliated. To hold otherwise would render *Elkins* and Rule 1.280 meaningless and create the same "chilling effect" from which *Elkins* sought to protect experts.

*Improper Methodology*

We begin with the observation that the notice of proposed subpoena duces tecum under review is unusual in its methodology. Specifically, it

8

more accurately appears to be a document *asking questions* or *requesting descriptions*, rather than *listing types of documents sought*. According to the petition, Respondent served Petitioner with a proposed subpoena duces tecum in conjunction with the oral deposition of a corporate representative on a date to be determined in the future. We further note that the order granting discovery directs that Petitioner's representative must bring to the deposition, "for reference purposes only," documents responsive to Respondent's requests. Thus, we assume the trial court construed the proposed subpoena duces tecum to be a discovery vehicle in which Respondent put Petitioner on notice of the questions Respondent would be asking during deposition, with the expectation that the deponent would bring documents to the deposition that would verify the answers to the questions.

The use of a proposed subpoena duces tecum for the production of documents for use at deposition is authorized under Florida Rule of Civil Procedure 1.310(b)(1). Fla. R. Civ. P. 1.310(b)(1) ("If a subpoena duces tecum is to be served on the person to be examined, the designation of the materials to be produced under the subpoena must be attached to or included in the notice [of taking deposition]."). We note that Florida Rule of Civil Procedure 1.351 addresses production of documents without deposition from non-parties. *See* Fla. R. Civ. P. 1.351(a). The procedure under rule 1.351 provides that advance notice of the request for production is accomplished by attaching to the notice a copy of the subpoena proposed to be served which, among other things, "shall include a designation of the items to be produced[.]" Fla. R. Civ. P. 1.351(b). We do not agree that the language of the rules requiring "the designation of the materials to be produced under the subpoena," Fla. R. Civ. P. 1.310(b)(1), or "a designation of the items to be produced" without deposition, Fla. R. Civ. P. 1.351(b), allows for a subpoena that asks questions or requests descriptions, rather than list the types of documents sought. Respondent has cited no caselaw for such an interpretation. Such an interpretation is fraught with problems, not the least of which would be the onslaught of motions addressing objections or compliance issues, revolving around interpreting the actual information sought by propounding a question.

*Subpoena Duces Tecum Seeks Unauthorized Information*

As stated above, the protections afforded to an expert under rule 1.280(b)(5)(A)(iii) and *Elkins* should extend to Petitioner. Accordingly, to the same extent such information could be obtained from an expert, we conclude it is proper to seek the production of documents from a business entity non-party with whom an expert is affiliated that could establish bias

on the part of the expert. Therefore, except as to paragraphs 1 and 15 of the proposed subpoena, we conclude that the trial court went well beyond the limits of rule 1.280(b)(5) and *Elkins*. The contested order permits excessive discovery, with no finding of unusual or compelling circumstances. For example, the request under paragraph 2 ("Overview and Ownership") quoted above, seeks the following information:

> Provide the names and identities of all persons or entities who hold or have held a direct or indirect ownership interest in your Practice. Describe how the owners share and divide in the Practice[']s profits, revenues, and expenses. Does the medical Practice track the amount of business generated by each doctor within the Practice? If yes, how so? Does the doctor that brings in or obtains the patient or medical exam receive a larger share of the revenue generated by that examination? Do the other doctors within the Practice also share in the revenue generated by the doctor that brought in the patient or exam to a lesser degree?

Such a request is not authorized under rule 1.280(b)(5)(A)(iii) or *Elkins*. We reject Respondent's argument that proof that the defense law firm hired Petitioner, a business entity with nine doctors, for 120 cases in three years supports an "unusual or compelling circumstance" for the requested information.

Finally, to the extent this case presents a novel issue, we note Judge May's specially concurring opinion in *Coopersmith v. Perrine*, 91 So. 3d 246 (Fla. 4th DCA 2012):

> In an effort to discredit medical witnesses for the other side, attorneys for both plaintiffs and defendants are exceeding the bounds of the rules of civil procedure, confidentiality laws, and professionalism by engaging in irrelevant, immaterial, burdensome, and harassing discovery. Parameters have already been expanded to allow both sides to explore financial interests of medical witnesses and the volume of referrals to those witnesses. *See Elkins v. Syken*, 672 So. 2d 517 (Fla. 1996). And now, attempts to expand the scope of that discovery to treating physicians as well as retained experts are usurping the limited resources of our trial courts. This not only creates unnecessary burdens on our over-strained justice system, it further taints the public's view of our profession.

10

*Id.* at 248 (May, C.J., specially concurring). We caution trial counsel from employing, and trial courts from approving, novel discovery methods which exceed the limits of authorized discovery.

*Petition granted.*

DAMOORGIAN and LEVINE, JJ., concur.

\*       \*       \*

***Not final until disposition of timely filed motion for rehearing.***

11